**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-1860**

───────────

CASSIOPIA RHOADS,

Plaintiff - Appellee,

v.

ERIK RIDDELL; JESSICA WHITAKER,

Defendants - Appellants,

and

SOUTHERN HEALTH PARTNERS, INC.; ROBERT J. WILLIAMS, M.D.; BRANDI GALLOWAY; DONNA WRIGHT; CHANATE BUCHANAN; TONETTA BUGGS; TAMARA ERIKSON,

Defendants.

───────────

Appeal from the United States District Court for the District of South Carolina, at Anderson. Sherri A. Lydon, District Judge. (8:22−cv−01409−SAL)

───────────

Argued: May 6, 2026                    Decided: July 2, 2026

───────────

Before NIEMEYER, THACKER, and RUSHING, Circuit Judges.

───────────

Affirmed by published opinion. Judge Thacker wrote the opinion in which Judge Niemeyer joined. Judge Rushing wrote an opinion concurring in the judgment.

───────────

**ARGUED:** Andrew Lindemann, LINDEMANN LAW FIRM, P.A., Columbia, South Carolina, for Appellants. William Camden Lewis, RICHARDSON THOMAS LLC, Columbia, South Carolina, for Appellee. **ON BRIEF:** Francis M. Hinson, IV, HHP LAW GROUP, Columbia, South Carolina; Patrick J. McLaughlin, WUKELA LAW OFFICE, Florence, South Carolina, for Appellee.

THACKER, Circuit Judge:

Erik Riddell ("Riddell") and Jessica Whitaker ("Whitaker") (collectively "Appellants") moved for summary judgment, asserting they were entitled to qualified immunity, on a 42 U.S.C. § 1983 deliberate indifference claim asserted against them by Cassiopia Rhoads ("Appellee"). The district court denied the motion, and Appellants now seek review.

Appellee initiated the underlying action following her detention at the Aiken County Detention Center ("ACDC") from May 3, 2019, to June 2, 2019. During her thirty day detention, Appellee developed an abscess on the side of her head but was not taken to the hospital for medical intervention until a month had passed. Appellee alleges that Appellants, as supervisory correctional officers at ACDC, violated her Fourteenth Amendment substantive due process right to be free from deliberate indifference to her serious medical needs. Appellee alleges that Appellants failed to ensure Appellee received adequate medical care for the abscess on her head. The district court determined that genuine disputes of material fact relating to Appellants' knowledge of Appellee's condition and their decision not to get her proper medical care barred a ruling on qualified immunity at the summary judgment stage.

Appellants contest the district court's ruling, arguing that they did not violate any right that was clearly established in June 2019. Thus, they assert they did not have fair warning that their conduct toward Appellee was unconstitutional. For the reasons set forth below, we conclude that a pretrial detainee's right to adequate medical care and freedom

3

from deliberate indifference to her serious medical needs was clearly established and recognized by this Circuit at the time of the events in question.

Therefore, we affirm.

## I.

## A.

## The Medical Timeline

"Because this is an interlocutory appeal of a denial of qualified immunity, we recount the facts as the district court viewed them -- that is, in the light most favorable to [the nonmoving party], drawing all justifiable inferences in [her] favor." *Tarashuk v. Givens*, 53 F.4th 154, 158 (4th Cir. 2022) (quoting *Hicks v. Ferreyra*, 965 F.3d 302, 305 (4th Cir. 2020)).

Appellee was booked into ACDC on May 3, 2019. Her intake form indicated that she was detoxing from heroin, had overdosed two days earlier, and was experiencing dental pain. Accordingly, she was placed on a ten day detox medication regime requiring daily contact with medical personnel.

Beginning on May 7, 2019, Appellee started complaining of pain relating to a developing abscess on the side of her head. The events that occurred in the days that followed are outlined below:

- May 8: Appellee was seen by medical personnel three times in compliance with the withdrawal monitoring schedule.

- May 9: Appellee was seen twice by medical personnel for withdrawal monitoring.

- May 10: Appellee was monitored twice, according to the withdrawal monitoring form. But at 4:15 pm, there was an emergency call to Appellee's cell in which she

"was found laying on [the] floor on her back alert & orient[ed]." J.A. 101.[1] When a nurse arrived, Appellee began crying and said she had a headache and her nose was bleeding. Her vitals were checked and she was told to drink more fluids "due to detox." *Id.*

- May 11: Appellee was seen four times by medical personnel for withdrawal monitoring. Appellee also submitted her first inmate grievance, in which she complained of a "HUGE AB[S]CESS ON THE SIDE OF MY HEAD THAT KEEPS[]GETTING BIGGER AND HURTS REAL BAD I NEED MY TOOTH PULLED OR SOME ANTIBIOTICS." *Id.* at 110 (emphasis in original).[2]

- May 12: Appellee was seen by a nurse for her abscess complaint. Appellee rated her pain at a "10" out of 10. *Id.* at 111–12. The medical records document several broken teeth, "redness," and a "decayed tooth," for which Appellee was placed on the "dentist list" and prescribed ten days of antibiotics and seven days of ibuprofen. *Id.*

- May 13: Appellee was seen twice by medical personnel on her final day of withdrawal monitoring.

- May 16: Appellee submitted a second grievance complaining of a fever and "REALLY [B]AD PAIN" in her ear. *Id.* at 113 (emphasis in original).

- May 20: Appellee submitted a third inmate grievance, reporting "A F[L]UID LIKE SACK ON SIDE OF MY HEAD, ABOVE MY EAR. MY EAR ACHES AND IM STILL FIGHTING A FEVER[] AND SEVERE HE[A]D PRESSURE. MY EYES WATER CONSTANTLY AND I HAVE SEVERE NAUSEA [AND] VOMITTING. I ALSO FEEL DIZZY AND CANT FOCUS MY EYES WHEN I STAND UP. THE WHOLE RIGHT SIDE OF MY FACE IS SWOLLEN AND VERY PAINFUL. I HAVE NOT BEEN ABLE TO GET OUT OF BED FOR 4 PLUS DAYS ON THE EXCEPTION OF SHOWERING. PLEASE HELP ME AND SEND MOTRIN." *Id.* at 114 (emphasis in original). In response, a nurse told Appellee she would be seen at the next available sick call.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] In May–June 2019, ACDC utilized an electronic kiosk system allowing inmates to make requests for medical attention. These requests, known as "Inmate Grievance Records," were electronically forwarded to Southern Health Partners medical personnel for their review. J.A. 292–93. Southern Health Partners was contracted by ACDC to provide medical services to inmates.

- May 21: Appellee submitted a fourth grievance: "I HAVE FLUID UNDER MY SKIN ABOVE MY R[IGHT] EAR. BEEN THERE FOR 4 PLUS DAYS, WHOLE SIDE OF FACE IS SWOLLEN AND HAVE PLACED SEVERAL SICK CALLS AND HAVE NOT BEEN SEEN YET. I AM IN SEVERE PAIN AND PRESSURE IN MY HEAD." *Id.* at 115 (emphasis in original). Again, she was told she would be seen at the next available sick call.

- May 22: Appellee was seen by a nurse for the knot on her head. The nurse noted that the knot "now has a soft center." *Id.* at 118. Appellee asked to be seen by a doctor and a mental health provider. In response, she was advised by a nurse to finish her antibiotics, and she was placed on the list to see a doctor.

- May 23: Appellee received her first and only visit from a doctor -- Dr. Robert Williams. Dr. Williams noted a "small hematoma to [right] parietal scalp" and "tenderness," for which he prescribed warm compresses and three days of Tylenol. *Id.* at 102.

- May 24: Appellee submitted her fifth, and final, grievance indicating that she had not been seen by a dentist, and that although her condition had not improved, she had been taken off all pain medications.

At approximately 5:40 p.m. on May 24, Appellee "partook in a peaceful protest" by refusing to return to her cell until she was taken to the hospital for her pain. Appellee's Br. at 5. In response to her protest, Appellee was written up for misconduct and escorted to B-Max, ACDC's solitary confinement unit, by correctional officers, including Appellant Riddell. Notably, inmates in B-Max do not have access to the grievance kiosk. Appellee remained in solitary confinement until she was transported to the hospital on June 2.

On May 28th, medical staff responded to an emergency call after Appellee fainted in her B-Max cell. She was assisted to her bunk by Appellant Whittaker and another officer. Appellee again complained of swelling to the right side of her face. Dr. Williams was notified, and he ordered a CT scan in order to rule out a contusion to the brain. Appellee was also seen by a nurse on May 28th for a toothache and given ibuprofen.

6

On May 29 and 30, while still in B-Max, Appellee was given Tylenol for pain and swelling on the right side of her head.  And on May 31, Appellee was seen for increased pain from the protrusion on the right side of her temple.  She was then prescribed Tylenol for five days.

These events culminated on June 2, 2019, at 3:30 p.m. when Appellee was found unconscious on the floor of her B-Max cell.  Medical staff were able to revive her.  Thereafter, medical staff instructed Appellee and the pod officer that Appellee had to have "a buddy in place when she was getting up," as "she can't get up alone." *Id.* at 103.  At 6:30 p.m. that same day, medical personnel were again called to Appellee's cell because she was vomiting and running a fever.  At that time, medical staff told ACDC officers that Appellee had to go to the hospital.  She was transported to the hospital that evening.  At the hospital, Appellee was diagnosed with "Osteomyelitis with subgaleal and epidural abscesses" and severe sepsis, requiring her to undergo "a right parietal craniectomy."[3]  J.A. 22.

---

[3] Osteomyelitis is an infection in the bone complicated, in Appellee's case, by subgaleal and epidural abscesses -- that is, a collection of pus on the inside of the skull and near the spine. *Osteomyelitis*, Mayo Clinic (Dec. 10, 2024), https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913 [https://perma.cc/R5BT-MXT9]; Binita Timilsina, et al., *De novo subgaleal abscess complicated by spontaneous osteomyelitis and epidural abscess: a case report and review of literature*, 85 Annals of Med. & Surgery 5690, 94 (2023).  A "right parietal craniectomy" is a surgery that involves removing part of the skull to access the brain and skull base. *Craniectomy*, Cleveland Clinic (Apr. 13, 2023), https://my.clevelandclinic.org/health/treatments/24901-craniectomy [https://perma.cc/R9T3-DR42].

B.

Appellants Riddell and Whitaker

During Appellee's detention at ACDC, Lieutenants Riddell and Whitaker were supervisory correctional officers -- a role which required them to ensure "correctional officers in their command . . . follow[ed] and otherwise compl[ied]" with their training as ACDC personnel.  J.A. 329–30.  As a result, subordinate officers brought concerns regarding Appellee's deteriorating medical condition and the adequacy of her treatment to Riddell and Whitaker.

For example, Deputy Kimberly Kelley testified that she repeatedly raised issues regarding Appellee's care with Riddell and Whitaker.  Specifically, Kelley testified:

> Q: What kind of issues did you raise up the chain of command?
>
> A: Complaints that I felt like they weren't doing what they should have been doing to assist an inmate. Obviously, with [Appellee], I brought that issue up to Lieutenant Riddell, [and] I brought that issue up to Lieutenant Whitaker . . . .

J.A. 183–84.

Kelley further testified that in response to these complaints, Riddell and Whitaker's response was either that they "cannot overstep Medical" because "[i]f Medical doesn't want to send her out, we can't force them to do so," J.A. 184, or that Appellee "didn't need to be seen at a hospital," *id.* at 189.  Kelley also testified that she directly approached medical staff regarding her concerns about Appellee and her belief that Appellee needed to be seen at a hospital.  But when she did so, she "actually got backlash from [Riddell] because [she] had gone directly to Medical instead of allowing the inmate to submit

8

medical requests through the kiosk like they were supposed to." *Id.* at 185.  Of course, when Appellee was in solitary confinement, she could not follow that procedure because she could not access the medical kiosk.

Another correctional officer at ACDC, Deputy Carla Hill, testified "close to the time [Appellee] was sent" to the hospital, Hill observed Appellee to have a swollen area the size of a grapefruit on her head.  J.A. 219–20.  Hill became concerned because "Medical was saying that [Appellee] was self-inflicting, [but Hill] had never seen [Appellee] bang her head or hit her head on the floor or the wall." *Id.* at 219.  Hill told the nurse as much, but she also asked Deputy Lisa Bauer to check on Appellee to see if she thought Appellee's abscess was self-inflicted.  Deputy Bauer confirmed that Hill asked her to take a look at Appellee, and she, too, observed Appellee to have a swollen head.  Bauer further testified that she reported what she had observed to Whitaker. *Id.* at 508 ("I did notify Lieutenant Whitaker and tell her that I had seen the swelling on the side of [Appellee's] head.").

That same day, Hill reported her concerns to Whitaker "about how much swelling there was" on Appellee's head and that a nurse said it was self-inflicted, yet Hill did not believe that Appellee was inflicting it upon herself.  J.A. 613.  According to Hill, "Whitaker stated that she would talk to medical to find out what was going on." *Id.*  But Whitaker also reportedly asked Hill if she was sure she had kept a close watch on Appellee to assure it was not self inflicted, and Hill responded that she had.

For his part, Riddell testified that he could not recall anyone bringing to his attention that Appellee had an abscess.  And Whitaker similarly testified that she did not recall instructing correctional officers to monitor Appellee for any swelling or other medical

9

matter, nor did she recall being approached by Kelley, Hill, or Bauer about Appellee's condition.

## C.

### The Lawsuit

On May 2, 2022, Appellee filed the present action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to her serious medical needs by five ACDC correctional officers, three medical staff members, and Southern Health Partners (the employer of the medical staff).[4]

The ACDC officers moved for summary judgment, arguing that they were entitled to qualified immunity because "[u]nder clearly established law . . . an objectively reasonable correctional officer would understand that he/she was entitled to and should rely on the medical decision-making of the trained medical practitioners and is not constitutionally required to second-guess or override the treatment decisions made by those personnel." J.A. 60.

Initially, the district court granted summary judgment to the five ACDC officers. In doing so, the district court determined that the officers were entitled to qualified immunity because the record lacks evidence of the ACDC officers' subjective knowledge and

---

[4] In addition to the federal action, Appellee filed a separate state court action pursuant to the South Carolina Tort Claims Act against the Aiken County Sheriff's Office, the employer of the ACDC officers. J.A. 420; *Rhoads v. Southern Health Partners Inc. et al*, 2020-CP-02-02238 (October 13, 2023). Following trial in that case on October 9–13, 2023, the jury returned a verdict in favor of Appellee and awarded her damages in the amount of $950,000. *Id.*

10

disregard of a risk to Appellee's health and safety. The court noted that this conclusion was supported by the general proposition that "non-medical officers can defer to medical staff who are treating a pretrial detainee." J.A. 514.[5]

### D.

### Motion for Reconsideration

Appellee moved for reconsideration with respect to the district court's grant of summary judgment as to Riddell and Whitaker. Upon reconsideration, the district court identified several disputed facts at the crux of the qualified immunity analysis, including: (1) whether Appellants received repeated warnings from subordinate officers regarding their concerns as to Appellee's condition, (2) whether and to what extent Appellee's deterioration was clearly visible, and (3) to what extent Appellants knew of Appellee's inability to access medical help. The court noted that viewing the evidence in the light most favorable to Appellee, a genuine issue of material fact exists as to whether Appellants subjectively knew of Appellee's serious condition and yet chose not to act. Further, the court held that a reasonable jury could conclude that Appellants appreciated the seriousness of the risk to Appellee and yet consciously disregarded it.

Therefore, the district court concluded that qualified immunity is improper at this stage because "a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . *must* be reserved for trial.'" J.A. 2417

---

[5] Southern Health Partners and the three medical staff members settled with Appellee. Therefore, they were dismissed from the case.

11

(quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)) (emphasis supplied). In reaching this conclusion, the district court acknowledged its previous grant of summary judgment in Appellants' favor. But the court deemed reconsideration necessary in order "to prevent manifest injustice," due to its failure to "fully consider [the] weight and implications" of these disputed facts. *Id.* at 2414. Accordingly, on July 1, 2025, the district court granted Appellee's motion for reconsideration and vacated its prior order granting summary judgment and qualified immunity as to Riddell and Whitaker.

Appellants now appeal that decision, arguing that the district court erred in "denying qualified immunity to . . . Appellants where . . . Appellee's Fourteenth Amendment rights were not clearly established such that detention officers in . . . Appellants' position[s] would have fair warning that their conduct towards . . . Appellee was unconstitutional." Appellants' Opening Br. at 8.[6] Specifically, Appellants contend that, as non-medical personnel, they had no constitutional duty to "second-guess" or override the decision

---

[6] Appellants also argue that the district court improperly considered evidence that was submitted for the first time by Appellee in her motion for reconsideration, which Appellants' classified as an improper "document dump." Appellants' Opening Br. at 18–21. The district court anticipated this argument, noting in its order granting Appellee's motion for reconsideration, "the facts that it failed to adequately consider in its earlier order *were*, in fact, presented to the court at the time of summary judgment." J.A. 2411 (emphasis in original). And although "it [was] unfortunate that [Appellee] did not provide a more comprehensive presentation of the available evidence during the summary judgment phase, as such a submission would have aided the court's analysis . . . the substance of the relevant evidence" was clearly available at the time. *Id.*

The evidence that Appellee submitted which Appellants argue is improper consist of transcripts from the state court trial. We do not address this argument because our jurisdiction is limited to the narrow question of whether the right at issue was clearly established at the time of the conduct and not the district court's consideration of evidence.

12

making of the medical team and to seek a different course of treatment for Appellee. *Id.* at 30.

## II.

"A district court's denial of qualified immunity on summary judgment is reviewed de novo, applying the same legal standards as the district court did on summary judgment." *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021) (quoting *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016)). On review, "we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff." *Yates*, 817 F.3d at 884 (quoting *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005)). And "[t]o the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." *Id.* (quoting *Waterman*, 393 F.3d at 473). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

## A.

## Jurisdiction

Qualified immunity shields government officials from liability in a 42 U.S.C. § 1983 suit so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tarashuk v.*

13

*Givens*, 53 F.4th 154, 162 (4th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Determining whether an official is entitled to qualified immunity typically involves a two prong inquiry: "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021) (quoting *Est. of Armstrong ex rel. Armstrong v. Vill. Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016)). "We may address the questions in 'the order of decision making that will best facilitate the fair and efficient disposition of each case.'" *Putnam v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)). If the answer to either of those questions is *no*, then the officer being sued is entitled to qualified immunity. *Id*.

Here, however, our review is limited to determining whether the right at issue was "clearly established" at the time of the events in question. This is so because the district court only denied qualified immunity on the ground that genuine disputes of material fact exist as to "[w]hether the conduct allegedly violative of the [clearly established] right actually occurred," thereby rendering summary judgment unavailable. J.A. 2417–18.

Typically, "we have no jurisdiction over a district court's denial of a motion for summary judgment based on the ground that the record presents disputed material facts." *Barricks v. Wright*, 168 F.4th 210, 214 (4th Cir. 2026). However, even in such circumstances, "if we take the disputed facts as the district court viewed them in the light most favorable to [Appellee] and they support, as a matter of law, [Appellants'] claim that [they] did not violate clearly established law, we have jurisdiction to grant [them] qualified

14

immunity." *Id.* at 215; *see also Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997) (en banc) ("[W]e possess jurisdiction to consider an appeal from a decision of a district court rejecting a government official's claim of entitlement to qualified immunity to the extent that the official maintains that the official's conduct did not violate clearly established law."); *Tarashuk*, 53 F.4th at 162 ("The second prong [of qualified immunity analysis] presents a 'purely legal question . . . [that] is always capable of decision at the summary judgment stage.'") (quoting *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005)).

B.

Defining the Right

The first step in determining whether a constitutional right is clearly established is to "defin[e] the precise right into which we are inquiring." *Halcomb*, 992 F.3d at 319–20 (quoting *Armstrong*, 819 F.3d at 907). This right must not be defined "at a high level of generality" but with precision. *Tarashuk*, 53 F.4th at 163.

"The Supreme Court has long held that 'a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment.'" *Tarashuk*, 53 F.4th at 163 (quoting *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)). "This right, like the Eighth Amendment right of convicted prisoners, 'requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.'" *Id.* (quoting *Belcher*, 898 F.2d at 34); *see also Thorpe v. Clarke*, 37 F.4th 926, 935 (4th Cir. 2022) ("[P]rison official[s] may be held liable for deliberate indifference to a prisoner's Eighth Amendment right to protection against [inhumane conditions] while in custody if the official knows that the inmate faces a substantial risk of serious harm and

15

disregards that risk by failing to take reasonable measures to abate it." (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011))).

Here, the district court defined the right at issue as a pretrial detainee's Fourteenth Amendment right to receive adequate medical care and to be free from deliberate indifference to their known medical needs. This definition has repeatedly been found by this circuit as sufficiently precise. *See, e.g.*, *Tarashuk*, 53 F.4th at 164 ("The constitutional right in question here is appropriately defined as a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his serious medical needs."); *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016) ("A prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 . . . ."). Therefore, we conclude the district court properly defined the right at issue.

## C.

### Was the Right Clearly Established?

Having defined the right at issue, we next determine whether the law at the time of the challenged conduct was "sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." *Halcomb*, 992 F.3d at 320 (quoting *Armstrong*, 810 F.3d at 907).

In doing so, "we first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose." *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020). However, "[t]here is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his

16

conduct violated that right." *Scinto*, 841 F.3d at 236. "Government officials 'can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided *fair warning* that their conduct was wrongful.'" *Tarashuk*, 53 F.4th at 165 (emphasis supplied) (quoting *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020)).

Here, we conclude that a reasonable officer in Appellants' positions would have known that their conduct -- failing to respond to multiple indications that Appellee was receiving inadequate medical care and placing her in solitary confinement without access to channels to report her medical concerns -- could give rise to a Fourteenth Amendment violation. Indeed, there are a number of Fourth Circuit opinions that underscore the point that the right at issue was clearly established at the time of Appellants' interactions with Appellee.

For example, in *Gordon v. Kidd*, we held that the district court properly denied an officer's motion for summary judgment based on qualified immunity where the record demonstrated that the officer failed to take any action in response to information about a detainee's suicidal intention. 971 F.2d 1087, 1094–95 (4th Cir. 1992). In reaching that decision, we concluded, "[p]retrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs. This right is clearly established." *Id.* (citation and internal quotation marks omitted).

Then, in *Iko v. Shreve*, we concluded that failing to conduct a medical evaluation or decontamination after pepper spraying an inmate during cell removal was an insufficient

17

response to the inmate's serious medical needs. 535 F.3d 225, 241–43 (4th Cir. 2008). There, we defined the right at issue as "the right to adequate medical care" and affirmed the district court's denial of qualified immunity. *Id.* at 243 n.12.

And in *Tarashuk v. Givens*, we determined that, in failing to properly assess and transport an unresponsive detainee with an altered mental state to a hospital where the detainee could obtain adequate medical attention, a reasonable official would have known that their conduct could give rise to a Fourteenth Amendment violation. 53 F.4th at 165–67. We reasoned that this is so because "our Circuit's case law gave Appellants 'fair warning' that disregarding a substantial risk of serious injury to the detainee or knowing of and ignoring a detainee's serious need for medical care violates the due process clause," even if there is no controlling authority dealing with the precise facts at issue in the case. *Id.* at 166.

Appellants counter that these cases no longer apply because in 2023, we revamped our understanding of deliberate indifference claims and adopted an objective test, requiring a pretrial detainee to demonstrate:

> [T]hat (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

18

Prior to *Short*, we applied a subjective standard. *See Short*, 87 F.4th at 604–11 (holding that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), abrogated our precedents requiring the application of the subjective element of the Eighth Amendment standard to a pretrial detainee's deliberate indifference claims under the Fourteenth Amendment). The subjective component of the prior test required "a pretrial detainee [to] show that the defendant 'knew of and disregarded [a] substantial risk to the inmate's health or safety.'" *Id.* at 609 (quoting *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023)); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (explaining the prior rule that "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

The timing of *Short* is important in the context of this appeal because *Short* was issued *after* the events relevant to this appeal occurred. This timing implicates our analysis as to whether the law *at the time of the challenged conduct* was "sufficiently clear [such] that every reasonable official would have understood what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The district court acknowledges this timing issue, noting that while *Short* was issued after the ACDC correctional officers' motion for summary judgment was fully briefed, "the objective standard from *Short* does not impact the arguments submitted by the parties," J.A. 2410, because under both the previous standard and the current standard, "'it is . . . not enough for the plaintiff to allege the defendant acted negligently or accidentally failed to do right by the detainee.

19

Negligence was not enough before and it is not enough now.'" *Id.* at 2411 (quoting *Short*, 87 F.4th at 611–12).

We agree with the district court on this point. *Short* did not change the fact that "at the time of [Appellants'] conduct, the law was sufficiently clear [such] that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 61 (internal quotation marks omitted). *Short* simply introduced a different method of establishing the knowledge element of a deliberate indifference claim. Indeed, in *Short* we aptly described the effect our ruling has on the test:

> The objective test we adopt today differs from our prior subjective test in *one respect only*. The plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. That showing *remains sufficient, but it is no longer necessary*. Now, it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley's* words, "objectively unreasonable," 576 U.S. at 397: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly. Or as the Supreme Court put it when describing civil recklessness in *Farmer*, it is enough that the plaintiff show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer*, 511 U.S. at 836. We go no further.

*Short*, 87 F.4th at 611 (emphases supplied).

In sum, *Short* merely replaced the subjective knowledge requirement with an objective test. Accordingly, before December 2023, when *Short* was issued, it was already clearly established that a pretrial detainee had a right to adequate medical care and the right to be free from deliberate indifference of a detainee's serious medical needs.

20

Yet, Appellants further argue that although "a pretrial detainee's right to be free from deliberate indifference by government officials to serious medical needs was clearly established prior to 2019," it is not clearly established in the law that a prison official, "knowing that an inmate is receiving medical treatment, should override the medical decision-making of the medical personnel and seek other care for the inmate" as to be liable for a deliberate indifference claim.  Appellants' Opening Br. at 21, 25.

Non-medical officers are *generally* entitled to rely on the expertise of medical staff. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").  But this case "does not [] present a situation in which prison officials might be held liable for the actions or inactions of a medical professional." *Iko*, 535 F.3d at 242. Instead "[t]he officers face liability for *their own* decisions, made while [Appellee] was in their charge." *Id.* (emphasis in original).

This distinction is significant here.  Appellee was being treated by medical personnel throughout her detention at ACDC for heroin withdrawal and dental issues, as well as the abscess on her head.  But Appellants' ability to rely on the decisions of the medical personnel was not without limit.  As the law stood in 2019, "government officials who ignore[d] indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate [could] be liable for deliberate indifference to medical needs." *Stevens*, 68 F.4th at 934 (quoting *Cooper v. Dyke*, 814 F.2d 941, 945 (4th Cir. 1987)); *see also*

21

*Tarashuk*, 53 F.4th at 166 (acknowledging that our precedent makes clear that the mere fact that prison officials provide some treatment does not mean they have provided "*constitutionally adequate* treatment" (emphasis in original) (quoting *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017)); *Heyer*, 849 F.3d at 211 ("While a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need.").

For example, in *Cooper v. Dyke*, police officers ignored repeated pleas from a pretrial detainee and his friends to obtain medical attention for the detainee's gunshot wound after paramedics failed to discover the injury during their initial examination. 814 F.2d at 944–46. The jury found the police officers liable for deliberate indifference to the detainee's serious medical needs in violation of § 1983. *Id.* at 943. On appeal, we affirmed the trial court's denial of the officers' motions for a directed verdict and judgment notwithstanding the verdict, holding that whether the police officers acted with deliberate indifference by ignoring repeated pleas for attention to detainee's gunshot wound was a question properly left to the jury. *Id.* at 946. As we concluded there, the law at the time established that "government officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs," particularly where "[c]ontinued complaints . . . or . . . manifest symptoms . . . would have put defendants on notice that additional care was required." *Id.* at 945.

22

The facts presented in this case, taken in a light most favorable to Appellee, provide ample evidence to support a conclusion that Appellants violated Appellee's clearly established constitutional rights. Appellee had an obvious "grapefruit sized" lump on the side of her head. And on May 24, 2019, Appellee refused to return to her cell because she wanted medical care. But instead of consulting with medical personnel or questioning *why* Appellee was protesting her medical care, Appellants placed Appellee in solitary confinement, where she lost her ability to submit additional medical grievances. At that point, Appellee had made *multiple* complaints. Moreover, other correctional officers raised the alarm regarding Appellee's care, including Deputy Kelley, who repeatedly raised with Appellants her concerns regarding Appellee's care. Deputy Hill did the same. Approximately five days before Appellee was taken to the hospital, Deputy Hill reported to Whitaker her concerns about the severe swelling on Appellee's head and her belief that the injury was not self-inflicted. And significantly, there is no indication in the record that Appellee was seen by *any* medical personnel after she was placed in solitary confinement until she fainted on May 28.

By ignoring these indications that Appellee's medical treatment was inadequate and by simultaneously removing Appellee's ability to report her medical issues, any reasonable official should have known that this conduct could subject them to a deliberate indifference claim.

Therefore, when taking the facts in a light most favorable to Appellee, we conclude that at the time of the alleged violations, our precedents provided Appellants "fair warning" that disregarding a substantial risk of serious injury to a detainee that is either known or so

23

obvious that it should be known violates the due process clause. *Tarashuk*, 53 F.4th at 165–66 (quoting *McKinney*, 976 F.3d at 418).

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

24

RUSHING, Circuit Judge, concurring in the judgment:

I agree with the majority that the constitutional right allegedly violated in this case was clearly established at the time of the events giving rise to this suit. I write separately, however, because I would define the constitutional right at issue more specifically than the majority. Even under the proper framing of the right, Defendants are not entitled to qualified immunity at this stage of the litigation. I therefore concur in the judgment.

In its qualified-immunity analysis, the majority defines the right at issue as "a pretrial detainee's . . . right to receive adequate medical care and to be free from deliberate indifference to [her] known medical needs." Maj. Op. 16; *see also id.* at 3–4. I would not define the right so broadly. "The Supreme Court has consistently admonished that we are 'not to define . . . clearly established law at a high level of generality.'" *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023) (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)); *see, e.g.*, *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018); *White v. Pauly*, 580 U.S. 73, 79 (2017); *Mullenix v. Luna*, 577 U.S. 7, 13 (2015). "Instead, we [must] 'pinpoint the precise constitutional right at issue.'" *King*, 76 F.4th at 266 (quoting *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022)). Granted, we have "require[d] less specificity when defining the right in the Eighth Amendment context than when the Fourth Amendment is implicated."[*] *Id.* But we have

---

[*] As the majority explains, Rhoads, as a pretrial detainee, asserted a deliberate-indifference claim under the Fourteenth Amendment, not the Eighth. Since the events giving rise to this suit, we have held that the standard for deliberate-indifference claims differs depending on which Amendment applies. *See Short v. Hartman*, 87 F.4th 593, 611–612 (4th Cir. 2023). Before *Short*, we applied the subjective standard associated with the (Continued)

25

recognized that "[e]ven in [the Eighth Amendment] context . . . , 'we must define the right in light of the specific context of the case, not as a broad general proposition.'" *Jones v. Solomon*, 90 F.4th 198, 208 (4th Cir. 2024) (additional internal quotation marks omitted) (quoting *Younger v. Crowder*, 79 F.4th 373, 385 (4th Cir. 2023)); *accord Cox v. Quinn*, 828 F.3d 227, 238–239 (4th Cir. 2016); *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White*, 580 U.S. at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

The majority's definition of the right at issue is too general. It does not take into account "'the specific context of th[is] case.'" *Jones*, 90 F.4th at 208 (quoting *Younger*, 79 F.4th at 385). Nor is it in any way "'particularized' to the facts" presented in the district court. *White*, 580 U.S. at 79 (quoting *Anderson*, 483 U.S. at 640). Instead, the majority's definition merely restates a general constitutional principle, formulated at the "high level

---

Eighth Amendment to Fourteenth Amendment deliberate-indifference claims asserted by pretrial detainees like Rhoads. *See id.* at 607. Now, we apply an "objective" standard. *Id.* at 611. This change in the law is irrelevant here because the district court found that a reasonable jury could conclude that Rhoads satisfied the Eighth Amendment's subjective standard. *See Rhoads v. S. Health Partners*, No. 8:22-cv-1409, 2025 WL 2201413, at *8 (D.S.C. July 1, 2025). That standard governed Defendants' conduct in 2019, and it "remains sufficient" to establish liability under the Fourteenth Amendment's objective standard. *Short*, 87 F.4th at 611. Thus, if the violation of the Eighth Amendment standard was clearly established in 2019, then Defendants are not entitled to qualified immunity. *See Mays v. Sprinkle*, 992 F.3d 295, 301–302 (4th Cir. 2021).

of generality" the Supreme Court has repeatedly cautioned against. *King*, 76 F.4th at 266 (internal quotation marks omitted).

The proper definition of the right must account for the facts of this case. *See Jones*, 90 F.4th at 208; *White*, 580 U.S. at 79. Taking the evidence in the light most favorable to Rhoads, the district court found that Defendants received "repeated warnings from subordinate officers" about the inadequacy of Rhoads's medical care and her deteriorating condition; witnessed "visible signs of [Rhoads's] deterioration"; and knew that because Rhoads was in segregation, she had limited, if any, access to medical help. *Rhoads*, 2025 WL 2201413, at *8; *see id.* at *3–4 (recounting the evidence presented). But despite all this, Defendants "chose not to act." *Id.* at *8. Critical here, the district court found that "a reasonable jury could conclude that Defendants knew . . . that their inaction posed an unjustifiably high risk of harm" to Rhoads. *Id.* at *7; *id.* at *8 (finding a "genuine issue of material fact as to whether [Defendants] subjectively knew of [Rhoads's] serious condition and chose not to act"). That is, the court concluded that a jury could find that Defendants knew that doing nothing posed a substantial risk to Rhoads's health, even though Rhoads was under the care of medical staff. Defendants insisted that they, as "non-medical personnel[,] [could] defer to the judgment of [the] medical staff who [were] treating" Rhoads's abscess. *Id.* at *5; *see* J.A. 53. For that reason, they argued, their inaction was justified or, at the very least, not clearly unconstitutional. *See* J.A. 2396. The district court disagreed, *id.* at *5–7, ultimately finding that the constitutional violation was clearly established, *id.* at *8.

27

Given these specific findings, the question on appeal is whether it was clearly established that Defendants, knowing their inaction posed a substantial risk of harm to Rhoads even though Rhoads was being seen by medical staff, were required to take *some action* to abate that risk. Stated differently, the question is whether it was clearly established that Defendants could not stand by and do *nothing* to abate the known risk to Rhoads's health, based solely on the fact that Rhoads was receiving some medical treatment. Under our precedent, the answer is yes. Defendants are therefore not entitled to qualified immunity.

We have recognized that "'[i]f a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands.'" *Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see Rice v. Adams*, 172 F.4th 428, 433 (4th Cir. 2026). That general rule, however, is not absolute. For example, in *Cooper v. Dyke*, we held that a jury could find that law enforcement officers were deliberately indifferent to the plaintiff's serious medical needs where the plaintiff "repeatedly pled with the officers to obtain medical attention for [the plaintiff's] gunshot wound," even though the plaintiff "had already been examined" by paramedics. 814 F.2d 941, 945 (4th Cir. 1987). The officers claimed that "they reasonably relied on the medical judgments of the paramedics," but we disagreed. *Id.* We explained that "government officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs." *Id.* Because the plaintiff's "[c]ontinued complaints" and "manifest symptoms" "would have put [the officers] on notice that

28

additional care was required," *id.*, we found that there was "more than sufficient evidence of deliberate indifference to warrant submitting th[e] claim to the jury," *id.* at 946.

A similar result followed in *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986), a case relied on by the Court in *Cooper*. There, the incarcerated decedent was treated by prison medical officials for several days, during which he was examined in detail and prescribed medication. *Id.* at 181. But after the decedent received that care, his "condition substantially worsened." *Id.* at 182. We held that "[i]f the prison guards on duty at th[e] time" the decedent's condition worsened "were aware of [the decedent's] physical status but refrained from obtaining medical assistance, an inference of deliberate indifference would arise." *Id.* Relevant here, nowhere did we say that the guards were entitled to rely on the prison medical staff's prior treatment of the decedent. *See id.*; *see also Cooper*, 814 F.2d at 945 (finding that *Sosebee* "provide[d] strong support for [the plaintiff's] constitutional claim" that officers were deliberately indifferent to the plaintiff's serious medical needs even though paramedics had already examined the plaintiff).

Finally, our decision in *Iko* is also relevant. In that case, an inmate collapsed from pepper spray in the presence of a nurse and non-medical prison officers. 535 F.3d at 242. The non-medical officers asserted that they were "permitted to defer to the nurse's apparent decision *not to treat* Iko after he was pepper sprayed." *Id.* But the Court rejected the defendants' reliance on the nurse's inaction, instead finding that the officers could be liable "for *their own* decisions," and that the officers' decision not to "seek[] any medical evaluation or even decontamination" was an unconstitutionally "insufficient response to Iko's serious medical needs." *Id.* at 242–243.

29

Though these cases did not present the precise factual circumstances we have here, they clearly establish that Defendants, knowing that their inaction posed a substantial risk of serious harm to Rhoads, were not entitled to do nothing to abate that risk. Here, just as in *Cooper*, Defendants heard "[c]ontinued complaints" about Rhoads's worsening condition. 814 F.2d at 945. Rhoads complained multiple times about her abscess, and other correctional officers repeatedly told Defendants that they were concerned about Rhoads's care. Maj. Op. 23; *Rhoads*, 2025 WL 2201413, at *2–4. Also like in *Cooper*, Defendants saw Rhoads's "manifest symptoms." 814 F.2d at 945. She had an abscess "the size of a grapefruit" on the side of her head and fainted multiple times in her cell. *Rhoads*, 2025 WL 2201413, at *3 (internal quotation marks omitted). Moreover, Deputy Hill testified that she reported medical staff's suspected erroneous diagnosis of self-harm, putting the foundation for Rhoads's course of treatment directly at issue. All this "would have put [D]efendants on notice that additional care," or at least some additional action, "was required." *Cooper*, 814 F.2d at 945. Even so, "[t]here is no evidence that either [Defendant] contacted medical staff on [Rhoads's] behalf or took [any] other action" to abate the risk Rhoads faced. *Rhoads*, 2025 WL 2201413, at *6. Instead, they "chose not to act." *Id.* at *8.

Defendants do not dispute that, generally, choosing not to act in the face of a known, substantial risk to an inmate's health clearly violates the Constitution. Instead, they attempt to justify their inaction by pointing out that Rhoads was being seen by medical staff. But that argument fails under our precedents. The plaintiff in *Cooper* had been examined by paramedics, yet the Court still found a jury could determine whether the non-medical law

30

enforcement officers were deliberately indifferent. 814 F.2d at 945–946. The decedent in *Sosebee* had also been treated by prison medical officials, but we still held that non-medical guards could be found deliberately indifferent. *See* 797 F.2d at 181–182. And in *Iko*, a nurse decided not to administer treatment, but the Court still found that the officers' attempted reliance on that nurse's inaction failed. 535 F.3d at 242–243. In light of these decisions, Defendants' reliance on the treatment provided by medical staff fails at this juncture. And Defendants' inaction in this case is even more clearly improper given that Defendants knew that medical staff had potentially incorrectly diagnosed Rhoads's condition. *Cf. Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990) (finding wardens' reliance on medical staff's judgment justified in part only because "[n]o record evidence suggest[ed] why the wardens should not have been entitled to rely upon their health care providers' expertise").

At bottom, it was clearly established that Defendants, knowing that their inaction posed a substantial risk to Rhoads's health, had to do *something* to abate that risk. Had Defendants taken some action to mitigate Rhoads's condition, this would be a closer case. *See King*, 76 F.4th at 266 (holding, in case where officer took steps to mitigate a general risk, that the plaintiff "need[ed] precedent establishing that [the officer's] efforts to mitigate that risk . . . were constitutionally deficient"). But here, they did nothing. Because it was clearly established that the Constitution required Defendants to do *something*, the Court correctly affirms the denial of qualified immunity. I therefore concur in the Court's judgment.

31